STATE OF MAINE
ANDROSCOGGIN, ss

RECEIVED & FILED

JUN 0 3 2015

ANDROSCOGGIN
SUPERIOR COURT

SUPERIOR COURT
CIVIL ACTION
AUBSC-CV-14-002

RACHEL RANDALL,

Plaintiff

v.

CENTRAL MAINE
MEDICAL CENTER,

Defendant

ORDER ON MOTION FOR
SUMMARY JUDGMENT

Before the court is defendant Central Maine Medical Center ("CMMC")'s motion for summary judgment. Plaintiff Rachel Randall's complaint includes three counts: (1) hostile work environment, (2) retaliation, and (3) slander per se. For the following reasons, CMMC's motion is granted in part and denied in part.

## FACTS

The following facts are presented in a light most favorable to the plaintiff as the non-moving party. Plaintiff Rachel Randall started working at CMMC in January 2011. (Def.'s Supp. S.M.F. ¶ 1; Pl.'s Add. S.M.F. ¶ 10.) Randall initially worked in the Maternity Ward until September 2011 when she transferred to the Surgical Department. (Pl.'s Add. S.M.F. ¶ 12.) In this role, Randall's direct supervisor was Shari Lavoie, the clinical coordinator of the operating room. (Def.'s Supp. S.M.F. ¶ 1; Pl.'s Add. S.M.F. ¶ 9.) The manager of the operating room was Joann Geslak. (Def.'s Supp. S.M.F. ¶ 1.)

On December 6, 2011, Randall had her 90-day review and was rated "meets" expectations in every category of the review. (Pl.'s Add. S.M.F. ¶ 12.) Following that review, Randall had several documented performance issues.

On February 28, 2012, Randall received verbal counseling after she assisted on a surgical procedure. (Def.'s Supp. S.M.F. ¶ 2; Pl.'s Add. S.M.F. ¶ 13.) The discipline was documented, and Randall filed a written rebuttal. (Pl.'s Add. S.M.F. ¶ 13.) On April 18, 2012, Lavoie issued Randall a documented verbal warning because of an error during another procedure. (Pl.'s Add. S.M.F. ¶ 14; Def.'s Supp. S.M.F. ¶ 3.) Randall submitted a written rebuttal to the warning, which stated that she attended the procedure only for experience. (Pl.'s Add. S.M.F. ¶ 14.)

Two or three months prior to July 2012, Randall had an affair with her co-worker Linwood Dumeny. (Pl.'s Add. S.M.F. ¶ 17.) After Randall ended the affair, according to Randall, Dumeny began stalking her and the two co-workers had a tense relationship at work. (Pl.'s Add. S.M.F. ¶ 18.) Around this time, on July 18, 2012, Randall was disciplined for unprofessional and inappropriate behavior in an operating suite. (Def.'s Supp. S.M.F. ¶ 4.) After this incident, Randall complained to Human Resources at CMMC about Dumeny's behavior. (Pl.'s Add. S.M.F. ¶ 19; Def.'s Reply S.M.F. ¶¶ 19-20.) Randall and Dumeny eventually returned to a normal working relationship. (Pl.'s Add. S.M.F. ¶ 21.)

According to Randall, she did not receive any other discipline until December 2012, and there is no documentation of any discipline between July and December. (Pl.'s Add. S.M.F. ¶ 22; Def.'s Reply S.M.F. ¶ 22.) On December 10, Geslak counseled Randall after Randall violated CMMC's on-call policy when she was unavailable on December 7.[1] (Def.'s Supp. S.M.F. ¶ 9.) In December, other doctors complained about Randall's performance. (Def.'s Supp. S.M.F. ¶¶

---

1 Plaintiff's denial of this fact is not supported by the record citation. (Pl.'s Opp. S.M.F. ¶ 9.)

10-11, 17-18; Pl.'s Opp. S.M.F. ¶¶ 10-11, 17-18.)  Dr. D'Augustine complained to Lavoie on December 18, 2012 about Randall's camera technique during a certain difficult procedure and asked that Randall not assist on that specific procedure. (Def.'s Supp. S.M.F. ¶ 10, as qualified by Pl.'s Opp. S.M.F. ¶ 10.) According to Lavoie, Dr. Regan complained about Randall's sterile technique the morning of December 19, 2012 and asked that she not work in his operating room. (Def.'s Supp. S.M.F. ¶ 11.) Randall denies that Dr. Regan ever raised any issues about her performance, and there is no documentation regarding Dr. Regan's complaint. (Pl.'s Opp. S.M.F. ¶ 11.)

On December 19, Randall was assigned to assist a Dr. Drouin on a procedure. (Def.'s Supp. S.M.F. ¶ 17.) After the procedure, Dr. Drouin complained about Randall's performance and asked that Randall not be assigned to assist on his cases in the future.[2] (Def.'s Supp. S.M.F. ¶ 17.) At the time, Lavoie and Geslak did not document Dr. Drouin's complaint in writing.

After work on December 19, 2012, Dumeny commented to Randall, "hey, I think you will find this funny. Dr. Regan asked me today if I fucked you. And I said what? He said, he asked did you or did you not fuck Rachel Randall." (Pl.'s Add. S.M.F. ¶ 27; Def.'s Reply S.M.F. ¶ 27.) Randall was shocked and upset by the comments, and she drove home and told her husband. (Pl.'s Add. S.M.F. ¶ 28.) Dumeny was referring to a conversation that occurred during work in the operating suite while other co-workers were present. (Pl.'s Add. S.M.F. ¶ 29.)

---

2 Although Randall disputes that her performance was poor, she offers no evidence to contradict the fact that Dr. Drouin believed her performance was poor and complained to Geslak. (Pl.'s Opp. S.M.F. ¶ 17.)

3

When Randall arrived at work on December 20, she filed a complaint with Geslak about the incident. (Pl.'s Add. S.M.F. ¶ 31.) According to Randall, Geslak gasped and said she would get to the bottom of it. (Pl.'s Add. S.M.F. ¶ 32.) She understood that Randall was making a very serious allegation. (Pl.'s Add. S.M.F. ¶ 33.) Randall expressed to Geslak her belief that Dr. Regan's conversation with Dumeny was sexual harassment and violated CMMC's sexual harassment policy. (Pl.'s Add. S.M.F. ¶¶ 35-36.) According to CMMC's sexual harassment policy, common examples of sexual harassment include "slurs, jokes or degrading comments of a sexual nature, or suggestive or lewd remarks." (Pl.'s Add. S.M.F. ¶ 3.)

Geslak investigated the complaint by speaking with Dumeny and Dr. Regan, however, Geslak's conversation with Dr. Regan is not documented. (Pl.'s Add. S.M.F. ¶¶ 39-43; Def.'s Reply S.M.F, ¶¶ 39-43.) Dr. Regan does not recall speaking with anyone about the incident. (Pl.'s Add. S.M.F. ¶ 42.) When Dumeny discussed the incident with Geslak, he offered a different version of the conversation from what he shared with Randall. (Pl.'s Add. S.M.F. ¶ 39.) He reported that, although Dr. Regan's comments were sexual in nature, he did not use the "f" word and did not mention Randall by name. (Pl.'s Add. S.M.F. ¶ 39; Def.'s Supp. S.M.F. ¶ 32.)

After Dumeny met with Geslak, Randall approached him and shared that she had reported to Geslak about Dr. Regan's comments. (Def.'s Supp. S.M.F. ¶ 25.) Dumeny told her that Dr. Regan did not say exactly what he originally told Randall, but, according to Randall, Dumeny did not say specifically what Dr. Regan said in the operating suite. (Def.'s Supp. S.M.F. ¶ 26, as qualified by Pl.'s Opp. S.M.F. ¶ 26.)

4

After Geslak allegedly spoke with Dumeny and Dr. Regan, she concluded on December 20 that the sexual harassment complaint was unfounded. (Pl.'s Add. S.M.F. ¶ 40; Def.'s Reply S.M.F. ¶ 40.) She did not speak with anyone else who was in the operating suite and heard Dr. Regan's comments that day. (Pl.'s Add. S.M.F. ¶ 40; Def.'s Reply S.M.F. ¶ 40.) Later that day, Geslak forwarded documentation about Randall to Lisa Burger, who works in human resources and requested advice about firing Randall. (Pl.'s Add. S.M.F. ¶ 52; Def.'s Supp. S.M.F. ¶ 43.) Burger reviewed the documentation and concluded that there was not enough to fire Randall because the documentation was written but not final. (Pl.'s Add. S.M.F. ¶¶ 53-54.) Burger also wrote, however, that she could support moving to termination based on a number of factors, including the fact that Randall "made a false accusation of sexual harassment against a physician." (Pl.'s Add. S.M.F. ¶ 55.)

On December 28, Geslak forwarded Burger's email to Lavoie and stated that they needed to give Randall a final written warning. (Pl.'s Add. S.M.F. ¶ 56, as qualified by Def.'s Reply S.M.F. ¶ 56.) Geslak then sent the documentation on Randall to Kirk Miklavic, Burger's supervisor in human resources. (Pl.'s Add. S.M.F. ¶ 57.) Miklavic responded that, although they had a good amount of information, there was no evidence of any discussion with Randall to get her perspective. (Pl.'s Add. S.M.F. ¶ 57.) Miklavic wrote that there was enough information to have a "nose to nose meeting" with Randall and temporarily stop scheduling her. (Pl.'s Add. S.M.F. ¶ 58.) CMMC never held any such meeting with Randall. (Def.'s Add. S.M.F. ¶ 59.)

In late December 2012 and early January 2013 Lavoie and Geslak began collecting statements from physicians and Randall's co-workers about their

5

issues with Randall. (Pl.'s Add. S.M.F. ¶¶ 60-61; Def.'s Reply S.M.F. ¶¶ 60-61.) The actual written comments from co-workers and doctors conflict with Lavoie's accounts. One email from Dr. D'Augustine to Geslak states that he did not want Randall holding the camera during one specific procedure but said that Randall's performance was not an issue during routine cases. (Pl.'s Add. S.M.F. ¶ 64.) He also states that he was disappointed with how Lavoie handled the situation, noting "her attitude and actions were unhelpful for the patient care issue." (Pl.'s Add. S.M.F. ¶ 65.)

Geslak also pressured one of Randall's co-workers, Jesse Zack, into making a written statement about Randall.[3] (Pl.'s Add. S.M.F. ¶ 49.) The statement relates an incident in which Randall used unprofessional language in questioning whether she was being punished, apparently for a work assignment. (Pl.'s Add. S.M.F. ¶ 49.)

Lavoie and Geslak also documented the complaint from Dr. Drouin about plaintiff's performance during a procedure on December 19. (Def.'s Supp. S.M.F. ¶ 17.) Another doctor confirmed that plaintiff's performance was poor during the procedure. (Def.'s Supp. S.M.F. ¶ 18.) According to Randall, Geslak and Lavoie did not initially take the complaint seriously. (Pl.'s Opp. S.M.F. ¶¶ 17-18.)

On January 7, 2013, Randall met with Lavoie, Geslak, and Burger and was given the option of resigning rather than being terminated. (Pl.'s Add. S.M.F. ¶¶ 69, 73.) Randall opted to resign. (Def.'s Supp. S.M.F. ¶ 43.) According to Randall she was "completely blindsided" by the accusations against her and was "bullied

---

3 Defendant's qualification that Zack was not pressured into making a statement is unfounded. Zack says in his statement that he was putting his comments in writing "under a degree of unwillingness." (Def.'s Reply S.M.F. ¶ 49; Zack Dep. Ex. 1.)

6

into resigning." (Pl.'s Opp. S.M.F ¶ 43; Pl.'s Add. S.M.F. ¶¶ 71, 73.) Randall was presented with an "Involuntary Termination Form" that accused Randall of making an "unfounded accusation against a surgeon regarding sexual harassment." (Pl.'s Add. S.M.F. ¶ 76.)

## DISCUSSION

### 1. Standard of Review

"Summary judgment is appropriate if the record reflects that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Dussault v. RRE Coach Lantern Holdings, LLC*, 2014 ME 8, ¶ 12, 86 A.3d 52 (quoting *F.R. Carroll, Inc. v. TD Bank, N.A.*, 2010 ME 115, ¶ 8, 8 A.3d 646). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *McIlroy v. Gibson's Apple Orchard*, 2012 ME 59, ¶ 7, 43 A.3d 948 (quoting *N. E. Ins. Co. v. Young*, 2011 ME 89, ¶ 17, 26 A.3d 794). "Even when one party's version of the facts appears more credible and persuasive to the court, any genuine factual dispute must be resolved through fact-finding, regardless of the nonmoving party's likelihood of success." *Lewis v. Concord Gen. Mut. Ins. Co.*, 2014 ME 34, ¶ 10, 87 A.3d 732. When a defendant moves for summary judgment, "the plaintiff must establish a prima facie case for each element of her cause of action." *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897.

### 2. Hostile Work Environment

Plaintiff does not oppose dismissal of her hostile work environment claim. (Pl.'s Mem. at 1 n.1.) Accordingly, count I of the complaint is dismissed.

### 3. Retaliation

7

Under the Maine Human Rights Act ("MHRA"), it is unlawful for an employer "to discriminate in any manner against individuals because they have opposed a practice that would be a violation of [the MHRA]." 5 M.R.S. § 4572(E) (2014). Sexual harassment and gender discrimination is unlawful under the MHRA. 5 M.R.S. § 4572(1)(A). To demonstrate a prima facie retaliation claim, a plaintiff must demonstrate: (1) she engaged in a statutorily protected activity, (2) the employer made an employment decision that adversely affected her, and (3) a causal link between the protected activity and the adverse employment action. *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 21, 45 A.3d 662. A retaliation claim is distinct from a discrimination claim and "does not require there to have been underlying discrimination." *Id.* ¶ 22. In deciding a motion for summary judgment on a retaliation claim, the court must apply a three-part, burden-shifting analysis: at step one the employee must demonstrate a prima facie case, at step two the burden shifts to the employer to produce evidence of a non-retaliatory reason for the adverse action, and, at step three the employee must show that the employer's stated reasons are false or that the employee was not fired for those reasons. *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 20, 824 A.2d 48; *Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶ 15, 66 A.3d 7.

a. Prima Facie Case

CMMC first challenges whether Randall engaged in protected activity under the MHRA. "A protected activity is broadly defined as conduct . . . that is in opposition to an unlawful employment practice of the defendant." *Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1054 (Me. 1992) (internal quotation marks omitted). Under this standard, a plaintiff need "only show that she had a reasonable belief that the conduct complained of amounted to an unlawful

8

employment practice . . . ." *Id.* CMMC argues that Randall could not have had an objectively *reasonable* belief as a matter of law that CMMC violated the MHRA when she reported Dr. Regan's comments to Geslak.

CMMC argues that this case is analogous to *Bowen*. In *Bowen*, the plaintiff, a female employee, resigned because vulgar and offensive language was frequently used in the office. *Id.* at 1053. Plaintiff filed suit and included claims of sexual discrimination and retaliation in her complaint. *Id.* at 1052. The court found that, because the vulgar language was directed at both men and women, plaintiff could not have "reasonably believed that the treatment she received . . . was occasioned by her gender and was therefore an unlawful employment practice." *Id.* at 1055.

This case is distinguishable from *Bowen*. At the time Randall complained to Geslak, she was under the impression that Dr. Regan had explicitly asked Dumeny, using vulgar language, whether Dumeny had had a sexual affair with Randall in front of Randall's co-workers. Nothing in *Bowen* is comparable to the comment that Dr. Regan allegedly made in front of hospital staff. Although the incident may not have happened the way Randall initially reported, the law is clear that there need not be any underlying discrimination for a plaintiff to prevail on a retaliation claim. Geslak took Randall's complaint seriously and understood that the complaint was a sexual harassment claim. Furthermore, CMMC's own sexual harassment policy identifies jokes and degrading comments of a sexual nature as common examples of sexual harassment. Randall's belief was not objectively unreasonable as a matter of law. Randall has therefore met her burden to generate an issue of fact as to whether she engaged in protected activity.

9

There is no dispute that Randall suffered an adverse employment action because she was forced to resign. The close temporal proximity between Randall's complaint and the adverse employment action is evidence of a causal link between the two for purposes of Randall's prima facie case. *Doyle*, 2003 ME 61, ¶ 20, 824 A.2d 48; *Daniels*, 2012 ME 80, ¶ 21, 45 A.3d 722. Randall has presented a prima facie case, and the court will therefore proceed to the second step of the analysis.

### b. Employer's Legitimate Rationale

At the second step, the employer must present evidence that it had legitimate, non-discriminatory reasons for the adverse employment action. There is no dispute that Randall had documented performance issues and that several doctors complained about Randall to her supervisors. CMMC has met its burden at the second step.

### c. Employee's Burden on Causation

Finally, the burden shifts to Randall to demonstrate that CMMC's allegations regarding Randall are false or were not the true reasons for her termination. *Daniels*, 2012 ME 80, ¶ 15, 45 A.3d 722. "[T]he issue of whether an employee has generated an issue of fact regarding an employer's motivation or intent is one heavily dependent on the individual facts before the court." *Id*. The Law Court has eschewed a strict "but for" test in determining whether there was a causal link between protected activity and an adverse employment action. *See Caruso v. Jackson Lab.*, 2014 ME 101, ¶ 13, 98 A.3d 221 ("We have explained that the jury must be instructed that even if more than one factor affects the decision to dismiss an employee, the employee may recover if one factor is unlawful discrimination and in fact it made *a difference* in determining whether he was to

10

be retained or discharged." (emphasis in original) (quotation marks and brackets omitted)).

Randall has produced evidence that her most recent written warning before her termination was in July 2012. Based on communications between human resources staff, there was a question of whether there was enough documentation to fire Randall. Miklavic advised that there should be a face-to-face meeting with Randall, but that meeting never occurred. Only after Randall filed her complaint did Lavoie and Geslak attempt to gather written documentation about previous complaints against Randall. If those complaints were serious enough to warrant firing Randall, Lavoie and Geslak would likely have documented those complaints at the time they were made. The documentation that they did gather shows that Dr. D'Augustine was unhappy with the way that Lavoie handled his complaint about Randall. In addition, Zack's written complaint against Randall states that Zack reluctantly put his statement in writing. Thus, it appears that Lavoie and Geslak were determined to fire Randall and were simply trying to collect enough documentation to justify it.

There is also no evidence to show that Randall's complaint was fully investigated because Lavoie and Geslak apparently did not speak with anyone else who was present for Dr. Regan's comments. Nevertheless, Burger's email suggests that CMMC staff explicitly based her termination, at least in part, on Randall's complaint. The involuntary termination form presented to Randall states that she made an "unfounded accusation" of sexual harassment. There is no evidence in the record to support a finding that Randall's complaint was made in bad faith. Drawing all inferences in favor of Randall as the non-moving party, she has generated genuine issues of material fact on her retaliation claim.

11

### 4. Slander Per Se

The elements of a defamation claim are: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Morgan v. Kooistra*, 2008 ME 26, ¶ 26, 941 A.2d 447. Statements made by an employer concerning the termination of an employee are conditionally privileged. *Cole v. Chandler*, 2000 ME 104, ¶ 6, 752 A.2d 1189. "Once it is determined that the defendant is entitled to the privilege, the burden shifts to the plaintiff to come forward with evidence that could go to a jury that [the defendant] abused the privilege." *Id.* (internal quotation omitted). An employer abuses the privilege by "making statements outside normal channels or with malicious intent." *Id.*

Randall alleges in her complaint that CMMC made defamatory statements concerning her job performance and her claim of sexual harassment. These statements were made in connection with CMMC's decision to terminate Randall's employment, and Randall offers no evidence to show that the statements were made outside normal channels or with malicious intent. CMMC is entitled to judgment on count III of Randall's complaint.

### CONCLUSION

Randall does not oppose dismissal of her hostile work environment claim, and that claim will therefore be dismissed. Randall has generated genuine issues of material fact on her claim of retaliation under the Maine Human Rights Act, precluding summary judgment on that count of her complaint. Finally, Randall has failed to show that CMMC abused the conditional privilege for statements

12

made during the course of the termination of an employee, and summary judgment is therefore appropriate on Randall's slander claim.

The entry is:

> Count I of plaintiff's complaint is dismissed.
> Summary judgment is denied on count II of plaintiff's complaint.
> Summary judgment is granted on count III of plaintiff's complaint.

Date: ___6/3/15___          _____
MaryGay Kennedy
Justice, Superior Court

13

RACHEL RANDALL - PLAINTIFF

Attorney for: RACHEL RANDALL
GUY D LORANGER - RETAINED
LAW OFFICE OF GUY D LORANGER
ONE GRANNY SMITH COURT SUITE 3
OLD ORCHARD BEACH ME 04064


vs
CENTRAL MAINE MEDICAL CENTER - DEFENDANT

Attorney for: CENTRAL MAINE MEDICAL CENTER
MICHAEL POULIN - RETAINED 01/28/2014
SKELTON TAINTOR & ABBOTT
95 MAIN STREET
AUBURN ME 04210

Attorney for: CENTRAL MAINE MEDICAL CENTER
AMY DIETERICH - RETAINED 01/08/2015
SKELTON TAINTOR & ABBOTT
95 MAIN STREET
AUBURN ME 04210

SUPERIOR COURT
ANDROSCOGGIN, ss.
Docket No AUBSC-CV-2014-00002

**DOCKET RECORD**

Filing Document: COMPLAINT                    Minor Case Type: CONSTITUTIONAL/CIVIL RIGHTS
Filing Date: 01/03/2014

## Docket Events:
01/03/2014 FILING DOCUMENT - COMPLAINT FILED ON 01/03/2014

01/03/2014 Party(s):  RACHEL RANDALL
          ATTORNEY - RETAINED ENTERED ON 01/03/2014
          Plaintiff's Attorney: GUY D LORANGER

01/27/2014 Party(s):  CENTRAL MAINE MEDICAL CENTER
          SUMMONS/SERVICE - ACK OF RECEIPT OF SUMM/COMP SERVED ON 01/06/2014
          MICHAEL POULIN OBO CENTRAL MAINE MEDICAL CENTER

01/27/2014 Party(s):  CENTRAL MAINE MEDICAL CENTER
          SUMMONS/SERVICE - ACK OF RECEIPT OF SUMM/COMP FILED ON 01/27/2014

01/28/2014 Party(s):  CENTRAL MAINE MEDICAL CENTER
          RESPONSIVE PLEADING - ANSWER & AFFIRMATIVE DEFENSE FILED ON 01/28/2014

01/28/2014 Party(s):  CENTRAL MAINE MEDICAL CENTER
          ATTORNEY - RETAINED ENTERED ON 01/28/2014
          Defendant's Attorney: MICHAEL POULIN

01/28/2014 ORDER - SCHEDULING ORDER ENTERED ON 01/28/2014
          MARYGAY KENNEDY , JUDGE
          ORDERED INCORPORATED BY REFERENCE AT THE SPECIFIC DIRECTION OF THE COURT.  COPIES TO
          PARTIES/COUNSEL

01/28/2014 DISCOVERY FILING - DISCOVERY DEADLINE ENTERED ON 09/28/2014